## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

JARED JONES, individually and on behalf
of all others similarly situated,

                Plaintiff,

      v.

COMFORT SYSTEMS USA, INC., THE
INVESTMENT COMMITTEE OF THE
COMFORT SYSTEMS USA, INC. 401(K)
PLAN, and JOHN DOES 1-10,

                Defendants.

CIVIL ACTION NO.:

## CLASS ACTION COMPLAINT

Plaintiff, Jared Jones ("Plaintiff"), by and through his attorneys, on behalf of the Comfort Systems USA, Inc. 401(k) Plan (the "Plan"),[1] himself and all others similarly situated, states and alleges as follows:

### I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Comfort Systems USA, Inc. ("Comfort Systems" or the "Company"), and the Investment Committee for the Comfort Systems USA, Inc. 401(k) Plan and its members during the Class Period (the "Committee").

2.    The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Summary Plan Description for Comfort Systems

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

USA, Inc. 401(k) Plan ("SPD"), at 6 ("The Plan is a **defined contribution plan**".); *see also* Auditor's Report, attached to 2023 Form 5500 for the Plan, at 6 ("The Plan is a defined contribution plan. . . . The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).").

3.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Ma Kujanek v. Houston Poly Bag I Ltd.,* 658 F.3d 483 at 489 (5th Circuit 2011), *Martin on Behalf of Cal–Tex Protective Coatings v. Frail*, 2011 WL 13175089 at \*14 (W.D. Tex. 2011), *Main v. American Airlines Inc.,* 248 F.Supp.3d 786 at 792 (N.D. Tex. 2017).

4.      The Department of Labor ("DOL") has also explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process for selecting investment options and service providers." [2] *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

---

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

7.      The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

8.      Plaintiff alleges that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plan, to Plaintiff, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

9.      At all times during the Class Period, the Plan had over one-half of one billion dollars in assets under management. At the Plan's fiscal year end in 2020, the Plan had $742,098,138 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2020 Form 5500 for the Plan, Schedule H, at 2.

10.     By 2024, the Plan had $1,121,363,632 in assets under management. *See* 2024 Form 5500 for the Plan, Schedule H, at 2.

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

11.     The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 13,889 participants. *See* 2020 Form 5500 for the Plan, at 2. By 2024, the Plan had 20,272 participants. *See* 2024 Form 5500 for the Plan, at 2.

12.     With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain guaranteed investment fund with lower crediting rates when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

13.     Specifically, Defendants allowed substantial assets in the Plan to be invested in a Guaranteed Income Fund ("Prudential[4] GIF"). The Prudential GIF carried significantly more risk and provided a significantly lower rate of return than other comparable stable value funds that Defendants could have made available to Plan participants.

14.     Prudential benefited significantly from Plan participants being invested in the Prudential GIF. The assets invested in the Prudential GIF were held and invested by Prudential, which kept the spread (the difference between the amount Prudential earned on the investments and the amount Prudential paid to Plan participants). The crediting rates that Prudential provided to investors in the Prudential GIF were/are so low that Prudential reaped a windfall on the spread.

15.     Plaintiff also allege that the Defendants engaged in prohibited transactions with a party-in-interest. Specifically, Defendants breached their fiduciary duties of prudence by allowing a party-in-interest, Prudential,[5] to benefit from its provision of services to the Plan by receiving excessive compensation for managing the Prudential GIF.

---

[4] In 2023, Prudential Retirement Insurance and Annuity Company became Empower Annuity Insurance Company. *See* Auditor's Report, attached to 2023 Form 5500 for the Plan, at 13 ("The Plan invests in the [Empower Annuity Insurance Company ("Empower")] Guaranteed Income Fund (GIF)."). All references to "Prudential" and its affiliates throughout this complaint include the subsequently named Empower and its affiliates, where and when appropriate.

[5] "The Plan invests in pooled separate accounts and a guaranteed income fund managed by [Prudential Retirement Insurance and Annuity Company], an affiliate of the trustee; therefore,

4

16.     The arrangements and transactions with Prudential are prohibited transactions because they "amount[] to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

17.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

18.     Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II), and violation of ERISA's prohibited transactions (Count III).

## II.    JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, et seq.

20.     This Court has personal jurisdiction over Defendants because the Plan is administered in this District, meaning Comfort Systems transacts business in this District, resides in this District, and/or has significant contacts with this District, and because ERISA provides for nationwide service of process.

21.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C.

---

these investments qualify as party-in-interest transactions." Auditor's Report, attached to 2021 Form 5500 for the Plan, at 9.

§ 1391 because Comfort Systems does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

**Plaintiff**

22.    Plaintiff, Jared Jones ("Jones"), resides in Missoula, Montana. During his employment, Plaintiff Jones participated in the Plan. Mr. Jones invested in the Prudential GIF in the Plan and suffered injury to his Plan account due to the significant underperformance of the Prudential GIF.

23.    Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendants' unlawful conduct.  Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently, or as of the time his account was distributed, and what his account is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

24.    Plaintiff did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, and information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

25.    Comfort Systems USA, Inc. is the Plan sponsor and a named fiduciary with a principal place of business at 675 Bering Drive, Houston, Texas. *See* 2023 Form 5500 for the Plan,

at 1. Comfort Systems "is a leading building and service provider for mechanical, electrical and plumbing building systems."[6]

26.     The Company is the Plan administrator. *See* Plan Doc., at 116 ("The Sponsor, which shall be that administrator for purposes of the Code, shall be responsible for the administration of the Plan and, in addition to the powers and authorities expressly conferred upon it in the Plan, shall have all such powers and authorities as may be necessary to carry out the provisions of the Plan[.]").

27.     The Company also had the authority, and exercised that authority, to delegate fiduciary responsibilities to the Investment Committee for the Comfort Systems USA, Inc. 401(k) Plan. *See id.* ("The Sponsor shall also have the authority and discretion to engage an Administrative Delegate who shall perform, without discretionary authority or control, administrative function with the framework of policies, interpretations, rules, practices, and procedures made by the Sponsor or other 'named fiduciary'.").

28.     Comfort Systems appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

29.     Accordingly, Comfort Systems during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

---

[6] *See* https://comfortsystemsusa.com/#, last accessed on October 29, 2025.

30.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Committee Defendants**

31.     As discussed above, Comfort Systems appointed the Investment Committee for the Comfort Systems USA, Inc. 401(k) Plan to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services.

32.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

33.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

## IV.    CLASS ACTION ALLEGATIONS[7]

34.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following proposed class ("Class"):[8]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Comfort Systems USA, Inc. 401(k) Plan, at any time

---

[7] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[8] Plaintiff reserves the right to propose other or additional classes or subclasses in his motion for class certification or subsequent pleadings in this action.

between February 3, 2020 through the date of judgment (the
"Class Period").

35.    The members of the Class are so numerous that joinder of all members is
impractical. The 2024 Form 5500 lists 20,272 Plan "participants with account balances as of the
end of the plan year."  2024 Form 5500 at 2.

36.    Plaintiff's claims are typical of the claims of the members of the Class. Like other
Class members, Plaintiff participated in the Plan and suffered injuries as a result of Defendants'
mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members
and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members
arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all
members of the Class have been similarly affected by Defendants' wrongful conduct.

37.    There are questions of law and fact common to the Class, and these questions
predominate over questions affecting only individual Class members.  Common legal and factual
questions include, but are not limited to:

> A.    Whether Defendants are/were fiduciaries of the Plan;
>
> B.    Whether Defendants breached their fiduciary duty of prudence by
>        engaging in the conduct described herein;
>
> C.    Whether the Company failed to adequately monitor the Committee and
>        other fiduciaries to ensure the Plan was being managed in compliance with
>        ERISA;
>
> D.    The proper form of equitable and injunctive relief; and
>
> E.    The proper measure of monetary relief.

38.    Plaintiff will fairly and adequately represent the Class and has retained counsel
experienced and competent in the prosecution of ERISA class action litigation.  Plaintiff has no
interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous

prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

39.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

40.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

41.     The Plan is a defined contribution plan covering all eligible employees of Comfort Systems. *See* Auditor Report, attached to 2023 Form 5500, at 6. ("The Plan is a defined contribution plan and is subject to the Employee Retirement Income Security Act of 1974 (ERISA). The Plan covers all employees of Comfort Systems USA, Inc. and Subsidiaries."); see also January 1, 2022 Summary Plan Description for Comfort Systems USA, Inc. 401(k) Plan ("SPD"), at 6 ("The Plan is a '**defined contribution plan**'.").

42.     Included in the Plan's available funds was the "[Prudential Retirement Insurance and Annuity Company (PRIAC)] Guaranteed Income Fund (GIF). The GIF is a broadly diversified, fixed-income portfolio within PRIAC's general account that meets the fully benefit-

responsive investment contract criteria and, therefore, is reported at contract value." Auditor's Report, attached to 2021 Form 5500, at 9.

43.    At the end of 2020, $92,496,318 in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2020 Form 5500 for the Plan, at 18.

44.    At the end of 2024, over $91 million in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the Plan, at 17.

45.    The chart below demonstrates the amount of Plan assets invested in the Prudential GIF during the Class Period.

| Plan Year | Plan Assets in Prudential GIF |
|---|---|
| 2020 | $92,496,318 |
| 2021 | $92,701,982 |
| 2022 | $106,059,795 |
| 2023 | $100,047,477 |
| 2024 | $92,589,954 |

*Eligibility*

46.    In general, the Plan covers substantially all employees of Comfort Systems. *See* Auditor's Report, attached to 2023 Form 5500, at 6. ("The Plan covers all employees of Comfort Systems USA, Inc. and Subsidiaries (collectively, the "Company"), except employees covered by a collective bargaining agreement (CBA), unless the CBA provides for coverage under the Plan, leased employees, nonresident aliens without United States source income, self-employed individuals, contract employees, and seasonal and temporary employees with less than 1,000 hours of service in a plan year.").

*Contributions*

47.     Eligible employees may elect to make contributions to their Plan accounts. *See* SPD, at 9 ("If you elect to make 401(k) Contributions, you authorize your Employer to reduce the Compensation you would regularly receive by a specified amount. This Amount is then deposited in your Account as a 401(k) Contribution.").

48.     Comfort Systems makes matching contributions once the participant becomes eligible to participate in the Plan. *See* SPD, at 11 ("Once you have met the requirements to participate in the Plan with respect to Regular Matching Contributions, as described in EIGIBILITY TO PARTICIPATE above, you may receive Regular Matching Contributions for a payroll period if you are a Covered Employee at any time during that payroll period.").

49.     Like other companies that sponsor 401(k) plans for their employees, Comfort Systems enjoys both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

50.     Comfort Systems also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

51.     Given the size of the Plan, Comfort Systems likely enjoyed significant tax and cost savings from offering a match.

## VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.    ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

52.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

53.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

54.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

55.     The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[9]

56.     Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

---

[9] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

57.     A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

58.     With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

59.     The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

60.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

61.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

62.     It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

63.     To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement o, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

14

64.    Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

65.    In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiff first wrote to the Plan administrator on March 19, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA. By letter dated April 7, 2025, Comfort Systems denied the Plaintiff's request for meeting minutes.

66.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4[th] 95, 111 (2d Cir. 2021) (emphasis in original).

67.    For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon several factors.

68.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Prudential GIF in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B.    Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the Prudential GIF**

69.    A stable value fund is a conservative, fixed income investment vehicle that provides a relatively stable rate of return.[10]

70.    Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[11]

71.    There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the Prudential GIF; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

72.    "When evaluating a traditional GIC, the most important consideration for the fiduciary-along with the contract terms-is the insurer's financial strength rating since an insurer's general account backs the guarantee that is at the core of this product."[12]

---

[10] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[11] *Id.*

[12] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

73.     As indicated above, the Plan was invested in the Prudential GIF, a proprietary stable value fund managed by Prudential, then later by Empower.

74.     There are two significant problems with the Prudential GIF discussed below. First, the Prudential GIF is a traditional GIC and is structured as a general account, fixed annuity contract. As a general account product, the Prudential GIF thus has the following characteristics: single-entity credit risk, plan-level illiquidity, lack of Plan participant ownership and investment control over assets, and lack of transparency as to fees.

75.     The second related problem with the Prudential GIF is that its crediting rates (*i.e.*, rates of return on investment) were/are well below what Defendants could have obtained for the Plan participants on the open market.

76.     Defendants' selection of the imprudent Prudential GIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 1.     Prudential/Empower Pose A Severe Risk Of Becoming Insolvent

#### a.     The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable

77.     Because a guaranteed insurance account product – like the Prudential GIF - is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer.  It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

78.     A June 7, 2023 Securities and Exchange statement declared that ratings issued by ratings agencies are not reliable.  It said these agencies shared blame for the 2008 financial crises:

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011 report noted, the markets' — and, at times the federal government's — reliance on credit ratings that

turned out to be highly misleading had consequences that reverberated "throughout the financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

*See* https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723

79.     The SEC's reference to reliable credit risk models is instructive. It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A") carriers are: (1) Higher Risk, Offshore Reinsurance and (2) Higher-Risk, Less-Liquid and Investment Concentrations.  *See generally*, September 13, 2022 Letter Submitted by Thomas D. Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf)[13]

80.     These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets.  This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

**b.      Based on its Insufficient Surplus, Prudential/Empower Was/Is at Severe Risk of Insolvency**

81.     Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only buffer between a viable insurer and an insolvent one. In other words, if an asset must be written down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

---

[13] The letter to The Hon.  Sherrod C. Brown is found within "Current Issues in Insurance, Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/

82.     An important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better.  The national average for the L&A industry is roughly 7.5%. That average of 7.5% is significantly pulled down by some of the larger, aggressive private equity-controlled carriers with much lower ratios.   During the Class Period, Empower (and before it, Prudential), had an alarmingly low S/L ratio.  For example, as of 2024, Empower's S/L ratio was less than 1%:

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

## LIABILITIES, SURPLUS AND OTHER FUNDS

| | | 1<br>Current Year | 2<br>Prior Year |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29. | Common capital stock | 2,500,000 | 2,500,000 |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | 0 | |
| 32. | Surplus notes | 0 | |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34. | Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35. | Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36. | Less treasury stock, at cost: | | |
| | 36.1 .......................... shares common (value included in Line 29 $ .......................... ) | | |
| | 36.2 .......................... shares preferred (value included in Line 30 $ .......................... ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ .......................... in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

Total Surplus: $    1,018,399,778   EAIC's 2024 Surplus to Liabilities
Total Liabilities: $ 106,414,669,390   Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**        **0.96%**        National Average is About **7.5%**.

83.     There are numerous L&A carriers that have substantially higher S/L ratios than Empower.  For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:

| | | | |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 218,473,153,964 | 206,607,540,338 |
| 29. | Common capital stock | | |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | | |
| 32. | Surplus notes | 4,233,167,821 | 4,232,366,504 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | |
| 34. | Aggregate write-ins for special surplus funds | 803,673,430 | 434,820,194 |
| 35. | Unassigned funds (surplus) | 21,390,599,996 | 20,626,889,733 |
| 36. | Less treasury stock, at cost: | | |
| | 36.1 .......................... shares common (value included in Line 29 $ .......................... ) | | |
| | 36.2 .......................... shares preferred (value included in Line 30 $ .......................... ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ .......................... in Separate Accounts Statement) | 26,427,441,247 | 25,294,076,431 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 26,427,441,247 | 25,294,076,431 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 244,900,595,211 | 231,901,616,769 |

Total Surplus: $   26,427,441,247   EAIC's 2024 Surplus to Liabilities
Total Liabilities: $ 218,473,153,964   Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**        **12.10%**        National Average is About **7.5%**.

c.      **Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus**

84.      Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below) **$2.64 billion in Reserve Credit** (column 9) to Hannover Life Reassurance Company of America (Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has *deducted* that $2.64 billion from its liabilities because the reinsurer has reportedly *set up* that amount in liabilities on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it difficult, most often impossible, to determine how the reinsurer is accounting for the transaction on their end.



85.      Separate and in addition to the reserve credit reported above, Empower has also entered into a Modified Coinsurance (ModCo) reinsurance contract with HLRCA Bermuda. Note below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:

86.    The total reported balance of **both offshore contracts is $28 billion**. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:



87.    The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer.  There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.[14]

88.    Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media

---

[14] *See* "Moody's Waves Yellow Flag as Worries Mount About Reinsurance Deals," by Warren S. Hersch, June 5, 2203 (quoting Moody's Investors Service as stating off-shore reinsurer "business provides less transparency for investors and is generally subject to less regulation than business that resides onshore in U.S.-regulated entity" *See also* "FSOC raises alarm on insurers' use of offshore reinsurance," by Kenneth Araullo, May 10, 2025 (stating "The US Financial Stability Oversight Council (FSOC) has raised concerns about the financial stability of life insurers, citing increasingly complex investment strategies and a growing reliance on offshore reinsurers with less stringent capital requirements."), available at https://www.insurance businessmag.com/reinsurance/news/breaking-news/fsoc-raises-alam-on-insuers-use-of-offshore-reinsurance-527931.aspx.

and numerous federal agencies have warned that the concern with offshore reinsurance, in addition to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[15] meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions.  *See* n. 17.

> **d.    Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid Investment Concentrations**

89.    Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

90.    The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

---

[15] "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by a variety of tactics, including restructuring transactions, financial engineering and geographic relocation to amenable jurisdictions." Investopedia, found at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp



91.     Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

***

92.     In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

### 2.     The Plan's Inclusion of the Prudential GIF

93.     At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Prudential GIF.

94.     "The GIF is a broadly diversified, fixed-income portfolio within EAIC's general account that meets the fully benefit-responsive investment contract criteria and, therefore, is reported at contract value." Auditor's Report, attached to the 2023 Form 5500 for the Plan, at 12.

95.     Under this term, a prudent fiduciary should be aware of the rates and prevailing marketplace on at least a "semi-annual" basis.

96.     The Form 5500 Auditor's Notes state as follows:

> The Plan invests in the EAIC Guaranteed Income Fund (GIF). The GIF is a broadly diversified, fixed-income portfolio within EAIC's general account that meets **the fully benefit-responsive investment contract criteria and, therefore, is reported at contract valu**e. Contract value is the relevant measurement for fully benefit-responsive investment contracts because this is the amount participants would receive if they were to initiate permitted transactions under the terms of the Plan.
>
> Contract value, as reported to the Plan by EAIC, represents contributions made under the contract, plus earnings at guaranteed crediting rates, less participant withdrawals and administrative fees. The concept of a value other than contract value does not apply to the contract even upon a discontinuance of the contract. Participants may direct the withdrawal or transfer of all or a portion of their account balance at contract value. In most circumstances, participants may not directly transfer amounts from this fund to a competing fund, the amount must be transferred to a non-competing fund for a period of 90 days before the amount can be invested in a competing fund.
>
> Interest is credited on the balance using a single "portfolio rate" approach. Under this methodology, a single interest-crediting rate is applied to all contributions made to the contract regardless of the timing of those contributions. Interest-crediting rates are reviewed on a semi-annual basis for resetting. **When establishing interest crediting rates for this product, EAIC considers many factors, including current economic and market conditions, the general interest rate environment, and both the expected and actual experience of a reference portfolio within the issuer's general account.** These rates are established without the use of a specific formula. The minimum crediting rate under the contract is 1.50%.
>
> **Generally, there are not any events that could limit the ability of the Plan to transact at contract value paid within 90 days or, in rare circumstances, contract value paid over time. There are also no events that allow the issuer to terminate the contract** and which require the plan sponsor to settle at an amount different than contract value paid either within 90 days or over time.

97.     Benefit responsive means that the participants can initiate transactions, such as withdrawals, at book value without adjustment.

98.     For these reasons, the Prudential GIF's crediting rates can be compared to traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive; (2) whose rates are reviewed regularly; and (3) whose contracts are with creditworthy insurance carriers.

99.     Defendants' selection of the imprudent Prudential GIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 3.     There are Many GICs in the Marketplace with Competitive Crediting Rates

100.     The Plan's fiduciaries should not have selected or maintained the Prudential GIF.

101.     The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

102.     Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plan, but were not selected by Defendants.

103.     These comparisons include:

- Auto-Owners Insurance Company Retirement Savings Plan offered a "fully benefit-responsive investment contract." Auditor's Report, attached to 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at 9. Further, like the Prudential GIC, "[t]he plan administrator does not believe that the occurrence of and such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id*., at 10. Finally, "[t]he guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*.

- The Shands Jacksonville Retirement Plan offers a traditional guaranteed investment contract with Variable Annuity Life Insurance Company ("VALIC"). Auditor's Report, attached to the 2023 Form 5500 for the Shands Jacksonville Retirement Plan, at 12. "The contract issuer is contractually obligated to repay the principal and interest at a specified interest rate that is guaranteed to the Plan." *Id*. Like the Prudential GIF, "[t]he crediting rate is reviewed on a quarterly basis for resetting." *Id*.

104.    The Prudential GIF in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[16] |
|------|-----------|---------------------|-------------|-------------------|--------------------|
| 2020 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.07% |
|      | Shands Jacksonville Retirement Plan | 6,138 | $322,951,592 | VALIC | 4.33% |
|      | **Comfort Systems Plan** | **13,889** | **$742,098,138** | **Prudential GIF** | **1.78%** |
|      |           |                     |             |                   |                    |
| 2021 | Auto-Owners Insurance Company Retirement Savings Plan | 7,480 | $711,146,156 | Auto-Owners Insurance Company | 3.02% |
|      | Shands Jacksonville Retirement Plan | 6,218 | $371,794,130 | VALIC | 4.43% |
|      | **Comfort Systems Plan** | **13,592** | **$851,538,842** | **Prudential GIF** | **1.67%** |
|      |           |                     |             |                   |                    |
| 2022 | Auto-Owners Insurance Company Retirement Savings Plan | 8,251 | $672,249,956 | Auto-Owners Insurance Company | 3.08% |

---

[16] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | Shands Jacksonville Retirement Plan | 6,782 | $343,252,624 | VALIC | 4.30% |
|---|---|---|---|---|---|
| | **Comfort Systems Plan** | **17,620** | **$794,257,814** | **Prudential GIF** | **1.68%** |
| 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Insurance Company | 3.48% |
| | Shands Jacksonville Retirement Plan | 7,204 | $396,147,444 | VALIC | 4.31% |
| | **Comfort Systems Plan** | **19,960** | **$941,247,305** | **Prudential GIF** | **1.92%** |
| 2024 | Auto-Owners Insurance Company Retirement Savings Plan | 8,950 | $864,332,421 | Auto-Owners Insurance Company | 3.40% |
| | Shands Jacksonville Retirement Plan | 7,498 | $443,251,343 | VALIC | 4.38% |
| | **Comfort Systems Plan** | **20,272** | **$1,121,363,632** | **Prudential GIF** | **2.12%** |

105.    Throughout the Class Period, the Prudential GIF in the Plan underperformed the comparator funds by at least 51%, as demonstrated in the table below.

| Year | Prudential GIF Rate of Return in the Plan | Comparator Average Rate of Return | Prudential GIF Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2020 | 1.78% | 3.70% | 51.89% |
| 2021 | 1.67% | 3.73% | 55.23% |
| 2022 | 1.68% | 3.69% | 54.47% |
| 2023 | 1.92% | 3.90% | 50.77% |

| 2024 | 2.12 | 3.89% | 43.19% |
|---|---|---|---|
| Average Underperformance during Class Period | | 51.11% | |

106. The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Prudential GIF's dismal crediting rate.

107. Again, specific Comparator GICs used herein all had similar risk considerations based on their terms and the creditworthiness of their insurance carriers. The Comparator GICs were all fully benefit-responsive and their crediting rates were all regularly reviewed in the same prevailing marketplace and economic circumstances as the Prudential GIF.

108. In short, because the Plan held between $500 million and $1 billion in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates.

109. Additionally, the Plan's Prudential GIF underperformed other traditional guaranteed investment contracts, with similar characteristics as the Prudential GIF, during the Class Period, as demonstrated in the table below:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[17] |
|---|---|---|---|---|---|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln National Life Insurance Co. | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |

---

[17] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | Comfort Systems Plan | 13,889 | $742,098,138 | Prudential GIF | 1.78% |
|---|---|---|---|---|---|
| | | | | | |
| 2021 | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln National Life Insurance Co. | 4.23% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Comfort Systems Plan | 13,592 | $851,538,842 | Prudential GIF | 1.67% |
| | | | | | |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln National Life Insurance Co. | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | Comfort Systems Plan | 17,620 | $794,257,814 | Prudential GIF | 1.68% |

| | | | | | |
|---|---|---|---|---|---|
| 2023 | The Valley Children's Hospital Defined Contribution Retirement Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | **Comfort Systems Plan** | **19,960** | **$941,247,305** | **Prudential GIF** | **1.92%** |
| 2024 | Lexmark Savings Plan | 2,926 | $1,211,057,397 | American General Life Insurance Company | 3.38% |
| | Martignetti Companies, LLC 401(k) Plan | 1,160 | $240,540,763 | Massachusetts Mutual Life Ins. Co. | 4.35% |
| | Northeast Medical Services Profit Sharing 401(k) Plan | 1,467 | $174,979,442 | New York Life Ins. Co. | 4.58% |
| | Boyd Company 401(k) Plan | 1,762 | $204,430,246 | Standard Insurance Company | 3.21% |
| | **Comfort Systems Plan** | **20,272** | **$1,121,363,632** | **Prudential GIF** | **2.12%** |

110.     A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from the Insurance Companies and/or

by submitting requests for proposals to Insurance Companies and other providers of stable value investments.

111.    By selecting the Prudential GIF with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

112.    With the significant amount of assets under management in the Prudential GIF, the losses suffered by Plan participants were devastating. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[18]

113.    The Prudential GIF in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar riskiness provided by other comparable carriers for other retirement plans.

## VII.    ERISA'S PROHIBITED TRANSACTIONS PROVISIONS

114.    Restrictions under ERISA prohibit fiduciaries from causing the Plan to engage in transactions with themselves or other fiduciaries or parties-in-interest. *See* 29 U.S.C. § 1106(a)-(b). Section 1106(a)(1) states, in pertinent part:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> ...
>
> (C)    furnishing of goods, services, or facilities between the plan and a party in interest;

---

[18] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

(D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

115.    Section 1106(b) further provides, in pertinent part:

A fiduciary with respect to the plan shall not –

(1)    deal with the assets of the plan in his own interest or for his own account,

(2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or

(3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

116.    During the Class Period, Defendants allowed Plan assets to be invested in the Prudential GIF that performed poorly when compared to other investments that were available, and knowing that Prudential, or its affiliates, were/are offering recordkeeping and trustee services to the Plan.[19]

117.    As an alternative to investing Plan assets in the Prudential GIF, the Plan could have invested assets in better performing investments with the same investment strategies and goals. Defendants failed to consider this approach because it would have eliminated the compensation earned by Prudential.

118.    Defendants did not prudently and objectively evaluate the Prudential GIF in the interests of Plan participants, as prudent fiduciaries would do. Rather, Defendants selected the Prudential GIF in order to benefit Prudential and its affiliates.

---

[19] "The Plan invests in pooled separate accounts and a guaranteed income fund managed by PRIAC, an affiliate of the trustee; therefore, these investments qualify as party-in-interest transactions." Auditor's Report, attached to 2021 Form 5500, at 13.

119.    The Plan's sizeable investment in the Prudential GIF provided Prudential a substantial amount of compensation at the expense of Plan participants.

## COUNT I
## Breaches of Fiduciary Duty of Prudence
## (against the Committee)

120.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

121.    At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

122.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

123.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

124.    As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Prudential GIF, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary

obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

125.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

126.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

### COUNT II
### Failure to Adequately Monitor Other Fiduciaries
### (against the Company)

127.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

128.    Comfort Systems (the "Monitoring Defendant") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and was aware that the Committee had critical responsibilities as fiduciaries of the Plan.

129.    In light of this authority, the Monitoring Defendant had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

130.    The Monitoring Defendant also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

131.    The Monitoring Defendant breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

132.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

133.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiff entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT III**
**PROHIBITED TRANSACTION**
**(against all Defendants)**

134.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

135.    Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

136.    Defendants were at all times fiduciaries to the Plan.

137.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

138.    Defendants caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transactions constituted a direct or indirect exchange of property between the Plan and Prudential.

139.    Defendants also caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between Prudential and the Plan.

140.    When Defendants caused the Plan to engage in the annuity transaction, Prudential was a party in interest, including because Prudential, or its affiliate, was a person providing recordkeeping and trustee services to the Plan. 29 U.S.C. § 1002(14). Defendants knew of that fact when they caused the Plan to engage in the annuity transaction.

141.    These transactions occurred each time the Plan paid fees to Prudential in connection with the Plan's investments in the Prudential GIF and other proprietary options that paid revenue sharing to Prudential.

142.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.　　　An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

the common fund doctrine; and

L.　　　Such other and further relief as the Court deems equitable and just.

Dated: February 3, 2026　　　　　　Respectfully submitted,

*Daniel L. White*
Daniel L. White, Esquire
TX Attorney ID #24090588
**WARD + WHITE PLLC**
14 ½ E. Louisianna Street
Suite 206
McKinney, TX  75069
Email: dwhite@wardwhitepllc.com
Tel.: (469) 941-0040

Mark K. Gyandoh, Esquire
(*Pro Hac Vice* to be requested)
James A. Maro, Esquire
(*Pro Hac Vice* to be requested)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
　　　　 jamesm@capozziadler.com
Tel.: (610) 890-0200

*Counsel for Plaintiff and the Putative Class*